UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL YODER, | ) | CASE NO. 1:18-CV-1831 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | JUDGE GEORGE J. LIMBERT |
| | ) | |
| ANDREW M. SAUL[1], | ) | |
| COMMISSIONER OF SOCIAL | ) | MEMORANDUM OPINION & |
| SECURITY ADMINISTRATION, | ) | ORDER |
| | ) | |
| Defendant. | ) | |

Michael Yoder ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") (1) erred in his assessment of Plaintiff's residual functional capacity ("RFC") because he did not properly evaluate certain medical opinions of record; and (2) failed in his duty to develop the record when he declined to issue a subpoena to obtain the reports of Drs. Koricke and Mease. ECF Dkt. #15. For the following reasons, the Court REVERSES the decision of the ALJ and REMANDS Plaintiff's case to the ALJ for reevaluation and further analysis of Dr. Keppler's opinion.

**I.      FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on October 20, 2015, alleging disability beginning October 25, 2010 due to right hand crush injury, three fingers amputated on the left hand, and lower back condition-disintegrated vertebrae. ECF Dkt. #11 ("Tr.") at 113,

---

[1]On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security, replacing acting Commissioner Nancy A. Berryhill.

125, 137-38.[2] The Social Security Administration ("SSA") denied his applications at the initial level and upon reconsideration. *Id.* at 123-24, 136, 144, 152, 161, 168. Plaintiff requested a hearing before an ALJ, and the ALJ held a hearing on October 13, 2017, where Plaintiff was represented by counsel and testified. *Id.* at 30-31, 173, 179. A vocational expert ("VE") also testified. *Id.* at 30-31.

On February 22, 2018, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Tr. at 8-23. Plaintiff requested that the Appeals Council review the ALJ's decision, and the Appeals Council denied his request for review on June 7, 2018. *Id.* at 1-5, 214-16. On August 9, 2018, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. He filed a merits brief on December 20, 2018 and Defendant filed a merits brief on April 5, 2019. ECF Dkt. #15; ECF Dkt. #18. The parties consented to the authority of the Magistrate Judge. ECF Dkt. #13.

## II.    RELEVANT PORTIONS OF ALJ'S DECISION

On February 22, 2018, the ALJ issued a decision finding that Plaintiff was not disabled. Tr. at 8-23. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act ("Act") through December 31, 2016. *Id.* at 14. He further found that Plaintiff had not engaged in substantial gainful activity since October 25, 2010, the alleged onset date. *Id.* Continuing, the ALJ determined that Plaintiff had the severe impairments of carpel tunnel syndrome, degenerative disc disease, other and unspecified arthropathies, and depression. *Id.* He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. *Id.* After considering the record, the ALJ found that Plaintiff had the RFC to perform light work, but with the following limitations: can handle items occasionally with the left hand, and can handle items frequently with the right hand;

---

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

can never finger with the left hand, but can frequently finger with the right hand; can never feel with the left hand; can climb ramps and stairs occasionally, never climbs ladders, ropes, or scaffolds; balance frequently; occasionally stoop, kneel, crouch, and crawl; can never work at unprotected heights, never near moving mechanical parts; can perform simple tasks with no strict production rate pace, and can tolerate routine workplace changes. *Id.* at 16.

The ALJ then stated that Plaintiff is unable to perform any past relevant work, was a younger individual on the alleged disability onset date, had at least a high school education, and could communicate in English. Tr. at 20-21. Next, the ALJ indicated that the transferability of jobs skill was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Plaintiff is "not disabled," whether or not the Plaintiff has transferable job skills. *Id.* at 21. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* For these reasons, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from October 25, 2010 through the date of his decision. *Id.* at 22.

## III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to Social Security benefits. These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). However, an ALJ's failure to follow agency rules

and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 937 (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009)) (internal citations omitted). Therefore, even if an ALJ's decision is supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.    LAW AND ANALYSIS

### A.    RFC AND MEDICAL OPINIONS

Plaintiff first asserts that the ALJ's RFC finding did not accurately depict Plaintiff's specific physical and mental limitations because the ALJ did not properly evaluate the medical opinions of record. ECF Dkt. #15 at 13-19. Specifically, Plaintiff avers that the opinions of Dr. Koricke and Dr. Dietz should have been afforded more weight with regard to their opinions about Plaintiff's mental impairments. *Id.* at 14-16. Also, Plaintiff avers that the the of Dr. Keppler, Dr. Frangiamore, and Dr. Hanicak should have been afforded more weight with regard to their opinions about Plaintiff's physical impairments. *Id.* at 16-19. For the following reasons, the Court finds that the ALJ did not err in affording little or partial weight to most of these opinions and substantial evidence supports that determination, except for the opinion of Dr. Keppler.

A claimant's RFC is an assessment of the most that a claimant "can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 404.1545(a)(2)-(3). The claimant bears the responsibility of providing the evidence used to make a RFC finding. 20 C.F.R. §§ 404.1545(a)(3). However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."). SSR 96-8p provides guidance on

assessing RFC in social security cases. SSR 96-8p. The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis. *Id.* Further, it states that the RFC assessment must be based on all of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations. *Id.*

The regulations require an ALJ to "consider" all the medical opinions in the record as well as "evaluate" them considering the factors of § 404.1527(c). 20 C.F.R. § 404.1527(b) & (c). These factors include the examining relationship; the treatment relationship, including the length of the treatment relationship and the frequency of examination as well as the nature and extent of the treatment relationship; supportability; consistency; specialization; and other relevant factors that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1527(c)(1)-(6).

### 1. Dr. Dietz

Plaintiff claims that greater weight should have been given to the opinion of State agency consultant, Dr. David Dietz, Ph.D., whose opinion is dated June 26, 2016. ECF Dkt. #15 at 14-16; Tr. at 89-91, 108-10. In relevant part, Dr. Dietz opined that Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 90, 109. In his explanatory narrative about sustained concentration and persistence capacities and/or limitations, Dr. Dietz explained that Plaintiff is "capable of routine 3 to 4 step tasks in an environment where production standards and schedules are more flexible." *Id.*

The ALJ afforded partial weight to Dr. Dietz's opinion. Tr. at 19. The ALJ reasoned that his opinion that the Plaintiff would be "capable of routine 3 to 4 step tasks in an environment where production standards and schedules are more flexible" was a vague limitation that was unsupported by the record. *Id.* (citing tr. at 90). The ALJ decided that a

more accurate interpretation of this limitation, which is consistent with the Dictionary of Occupational Titles ("DOT"), is "simple tasks with no strict production rate pace." *Id.*

Plaintiff argues that it is irrelevant whether the ALJ's limitation is consistent with the DOT. ECF Dkt. #15 at 15. Contrary to Plaintiff's assertion that the DOT is irrelevant, the Social Security regulations provide that the SSA will take administrative notice of "reliable job information" available from various publications, including the DOT. SSR 00-4p, 2000 WL 1898704, at *2 (citing 20 C.F.R. 404.4166(d)). In fact, "[i]n making disability determinations, we rely *primarily* on the DOT ... for information about the requirements of work in the national economy" at steps four and five of the sequential evaluation process. SSR 00-4p (emphasis added). SSA also uses VEs as sources of occupational evidence for complex vocational issues. SSR 00-4p, at *2 (citing 20 C.F.R. 404.4166(e)). Also, the occupational evidence provided by a VE "generally should be consistent with the occupational information supplied by the DOT." *Id.* Therefore, the DOT is relevant.

During the VE's testimony, the ALJ presented a hypothetical individual with certain limitations, including "limited to performing simple tasks with no strict, production-rate pace." Tr. at 67. The VE testified that such an individual could not perform the past work that Plaintiff performed, but could perform other jobs in the national economy. *Id.* at 67-68. Later, Plaintiff's counsel questioned the VE and the following exchange occurred:

> Q (Plaintiff's counsel): So if we went back to the first hypothetical and added in that the individual would need to be in an environment where production standards and schedules are more flexible, would that have any effect on your answer?
>
> A (VE): More flexible than what?
>
> Q: More flexible than normal.
>
> A: Sorry. I'm not sure exactly vocationally what you want me to answer to.
>
> Q: Okay. Well, let me ask – put it this way. For unskilled jobs, is there flexibility in production standards and schedules?
>
> A: Well, you know, I think we talk about production standards and production schedules in fast-paced production work. I think jobs that are not production jobs have general performance standards, and I think a certain amount of work has to get done in a certain period of time, but not really production standards and fast-paced things. Is there flexibility in how much work needs to get done and how much time? Not really. But they're not scheduled as a production line might be.

7

Q: No, I understand. That's – we're not talking about production lines.

A: Right.

Q: We're talking about–

A: Well, but you used the–

Q: –production standards and–

A: –word production. I wanted to be clear about–

Q: Right. And schedules, so is there flexibility generally in unskilled jobs for scheduling or production standards, I guess? So maybe, you know–

A: Keep the word production out. I think for unskilled work, there's only a very small degree of flexibility typically. Most of it is do it when it's scheduled.

Q: Okay. So if somebody needed flexibility in scheduling, would they be able to do the jobs that you cited?

A: I think it would be difficult for that person to sustain employment.

Tr. at 70-71. Plaintiff's counsel tried incorporating the exact limitation that Dr. Dietz noted in his opinion. *See id.* at 90, 109. However, the exact wording from Dr. Dietz's opinion caused some confusion for the VE, which led Plaintiff's counsel to rephrase the question more than once to get a satisfactory answer before moving on. *Id.* at 70-71. Accordingly, the Court finds that the ALJ did not err in characterizing Dr. Dietz's limitation as vague.

Due to the "vague" limitation, the ALJ interpreted the language in a way he stated was consistent with the DOT. Tr. at 19. However, Plaintiff asserts that the ALJ's interpretation is not consistent with Dr. Dietz's limitation. ECF Dkt. #15 at 15. He reasons that "[t]he ALJ's interpretation completely omits any flexibility regarding an individual's production standards or schedule." *Id.* Plaintiff then cites to the VE's testimony from the October 13, 2017 hearing to illustrate that Dr. Dietz's assessment is more limiting than the ALJ's interpretation because the VE testified that it would be difficult for an individual to sustain employment if that individual needed flexibility in scheduling. *Id.* (citing tr. at 71). Given the fact that the ALJ afforded partial weight to Dr. Dietz's opinion because the aforementioned limitation was vague and unsupported, the ALJ was free to interpret that particular limitation using DOT terminology. *See Williams v. Comm'r of Soc. Sec.*, No. 1:10-CV-02583, 2012 WL 1066778, at *3 (N.D. Ohio Mar. 28, 2012) (citing *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009)) ("Although the ALJ may not *substitute*

his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding.") (emphasis added); *see also* ECF Dkt. #15 (Plaintiff does not argue that Dr. Dietz's limitation was supported by the record). The Sixth Circuit has stated that "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed.Appx. 267, 275 (6th Cir. 2015) (internal citation omitted); *see also Majors v. Colvin*, 2014 WL 1238477, at *7 (N.D. Ohio Mar. 25, 2014) ("[A]n ALJ is not required to adopt every opinion expressed by a nonexamining medical expert, even when an ALJ overall accords that opinion great weight."). As such, the Court find that substantial evidence supports the ALJ's decision to afford partial weight to Dr. Deitz's opinion.

### 2. Dr. Koricke

Plaintiff contends that greater weight should have been given to the opinion of consultative psychologist, Dr. Deborah Koricke, Ph.D. ECF Dkt. #15 at 14-16. Dr. Koricke examined Plaintiff on June 7, 2016 for a disability assessment report. Tr. at 317-23. Dr. Koricke extensively reviewed Plaintiff's history. *Id.* at 317-20. She noted that Plaintiff was adopted, has 13 adoptive siblings, and was raised in an Amish household. *Id.* at 318. As a child, he observed his father beat his mother and he remembered that his adoptive father abused him, breaking his leg when he was an infant. *Id.* He also only recently discovered he was adopted, which made him feel "angry and deflated." *Id.* He had behavioral difficulty in school, and received special education instruction due to dyslexia. *Id.* Plaintiff was married twice. He has one daughter from his first wife of 14 years, but his first wife, while pregnant, was killed in a train accident in 2004. *Id.* His second wife of 2 years reportedly stole all of his money when they divorced. *Id.* Plaintiff reported that he last worked for J&S Environmental/Yoderscapes, and the government contracted the company for clean up services after the September 11 terrorist attacks. *Id*. He remembers cleaning up 500 bodies after 9/11. *Id.* Dr. Koricke also noted Plaintiff's physical impairments, including 3 lost

fingers on his left hand and that his right hand was crushed in a work accident. *Id.* at 319. He underwent back surgery on May 15, 2016 to remove 3 disks. *Id.* At the time of this assessment, he had been prescribed Cymbalta, Flexerall, and Percocet. *Id.* Plaintiff admitted to past alcohol use and a long history of Cannabis use and abuse. *Id.* He was also a frequent user of K2/Spice. *Id.* Plaintiff further reported that he completed a court ordered drug program after being arrested on drug-related charges. *Id.* at 319-20.

Dr. Koricke's mental status examination revealed that Plaintiff presented a good appearance and appeared to understand all questions posed to him, despite refusing to perform the serial 3's. Tr. at 320. His speech was clear, flow of conversation was slow, and his thinking appeared logical and linear. *Id.* He presented with blunted affect, cried several times, was cooperative, and reported feelings of hopelessness. *Id.* Plaintiff also reported consistently high levels of anxiety, flash backs to tragic events in his life, and panic attacks. *Id.* at 320-21. Dr. Koricke observed that Plaintiff did not appear to be distracted, delusional, or paranoid. *Id.* at 321.

After examining Plaintiff, Dr. Koricke diagnosed Plaintiff with Post-Traumatic Stress Disorder ("PTSD"); Alcohol Use Disorder, moderate (in early remission); Cannabis Use Disorder, severe (in early remission); and Major Depressive Disorder ("MDD'), moderate. Tr. at 321. She noted that Plaintiff demonstrated average abilities in understanding, remembering, and carrying out instructions. *Id.* at 322. She found he was persistent for mental status tasks but was easily frustrated and refused to complete some tasks. *Id.* at 322. She opined he would need much assistance and supervision to ensure accuracy when completing assigned tasks in other environments. *Id.* Further, she observed that Plaintiff was depressed, but he remained cooperative; exhibited some difficulty interacting due to blunted affect and depressed mood, but he appeared articulate; and he engaged in several crying spells throughout the examination. *Id.* Dr. Koricke found that Plaintiff presented as having insight and judgment regarding his current situation and that he appeared depressed, but not psychotic. *Id.* She concluded that he has limitations in his ability to respond appropriately to work pressures and task completion in an employment setting due to symptoms associated

with mood instability as a result of PTSD and MDD, as well as his physical limitations due to his physical deformities. *Id.*

The ALJ afforded partial weight to Dr. Koricke's opinion. Tr. at 20. In his decision, he noted that although the record and Plaintiff's testimony endorsed some mental limitations, they are not as severe as Dr. Koricke opined. *Id.* The ALJ pointed out that Plaintiff testified that he had not seen a psychiatrist in over a year, but was still able to function appropriately. *Id.* He also noted that Plaintiff was able to perform simple tasks with no strict production rate pace. *Id.*

Plaintiff argues that the ALJ did not cite to any evidence in the record that supports a finding that Plaintiff is only limited to the performance of simple tasks with no strict production rate pace. ECF Dkt. #15 at 15; tr. at 20. However, in his step three analysis of the "paragraph B" criteria, the ALJ cited Dr. Koricke's opinion exclusively. Tr. at 15-16. The Sixth Circuit has endorsed supporting a conclusion in a particular step of the ALJ's decision by looking to factual findings elsewhere in that decision. *See generally Forrest v. Comm'r of Soc. Sec.*, 591 Fed.Appx. 359, 365-66 (6th Cir. 2014) (finding that the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three); *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a step three medical equivalency determination). In relevant part, the ALJ found that Plaintiff has a mild limitation in understanding, remembering, or applying information. *Id.* at 15. He cited Dr. Koricke's opinion that Plaintiff demonstrated average memory and ability to follow verbal instructions, his overall cognitive or intellectual functioning appeared to be within an average range, and he understood verbal instructions. *Id.* (citing tr. at 322). He also found Plaintiff had moderate limitation in the area of concentrating, persisting, or *maintaining pace*. *Id.* (emphasis added). For support, the ALJ cited Dr. Koricke's opinion that Plaintiff had some difficulty completing multi-step tasks but was persistent for mental status tasks. *Id.* (citing tr. at 322). Accordingly, the Court finds that the ALJ cited to substantial evidence to support his conclusion that Plaintiff was limited to simple tasks with no strict production rate pace.

In addition, Plaintiff avers that the factors in the regulations support giving greater weight to Dr. Koricke's opinions. *Id.* (referring to the factors in 20 C.F.R. § 404.1527(c)). Plaintiff is correct in that the factors of the examining relationship, consistency, and specialization tend to favor giving more weight to her opinion. See ECF Dkt. #15 at 15-16; 20 C.F.R. § 404.1527(c). However, the ALJ only afforded partial weight to Dr. Koricke's opinion, relying on the fact that her opinion, dated June 7, 2016, was the first and only available record[3] of a visit. Tr. at 20 (citing only to Exhibit 1F); 20 C.F.R. § 404.1527(c)(2)(i).

The ALJ also relied on the supportability factor, stating that although the record and testimony endorsed some mental limitations, they were not as severe as Dr. Koricke opined. *Id.*; 20 C.F.R. § 404.1527(c)(3). The "severe" limitations appear to be Dr. Koricke's opinions that Plaintiff would need much assistance and supervision to ensure accuracy when completing assigned tasks in other environments, as well as Plaintiff having limitations in his ability to respond appropriately to work pressures and task completion in an employment setting due to symptoms associated with mood instability. *Id.* (citing tr. at 322). In his step three analysis, the ALJ noted that Dr. Koricke opined that Plaintiff demonstrated average memory and ability to follow verbal instructions, his overall cognitive or intellectual functioning appeared to be within an average range, and he understood verbal instructions. *Id.* at 15 (citing tr. at 322). The ALJ also noted that, during their interview, Dr. Koricke opined that the Plaintiff remained cooperative, utilized adequate speech, and had no difficulty tracking their conversation. *Id.* (citing tr. at 320). Further, the ALJ considered Dr. Koricke's opinion that Plaintiff had some difficulty completing multi-step tasks but was persistent for mental status tasks. *Id.* (citing tr. at 322). Despite Dr. Koricke's opinion that Plaintiff would have some limitations in his ability to respond appropriately to work pressures, the ALJ found that he had no limitation in the area of adapting or managing

---

[3] There is an issue regarding a second visit to Dr. Koricke that is not in the record. *See infra.* Part V(B). Even considering that Plaintiff visited Dr. Koricke on two occasions rather than one, the frequency of the examination factor would still not favor Plaintiff nor does Plaintiff allege that he visited Dr. Koricke on enough occasions to afford her treating physician status. *See* 20 C.F.R. § 404.1527(c)(2)(i).

oneself. *Id.* at 16 (citing tr. at 322). This evidence that the ALJ cited tends to internally contradict the "severe" limitations in Dr. Koricke's opinion and support the ALJ's conclusion to afford only partial weight to her opinion.

Finally, the ALJ noted that Plaintiff had not seen a psychiatrist in over a year and that despite the lack of treatment, he was still able to function appropriately. *Id.*; *see also id.* at 17; 20 C.F.R. § 404.1527(c)(6). However, the only mention of a psychological evaluation in the ALJ's decision was with Dr. Koricke, and the ALJ did not cite to any evidence of mental functioning post-dating her June 7, 2016 examination. *See* tr. at 18, 20. Such conclusory statements have no cited support in the ALJ's decision. *See generally Biestek v. Berryhill*, 139 S. Ct. 1148, 1159-60 (2019) (Gorsuch, J., dissenting) ("[C]learly mistaken evidence, fake evidence, speculative evidence, and conclusory evidence aren't substantial evidence."). Despite the apparent lack of support for this particular conclusion, the ALJ's decision regarding Dr. Koricke's opinion, as a whole, illustrates that he adequately weighed the relevant regulatory factors. The ALJ did not completely discount Dr. Koricke's opinion and, instead, afforded it partial weight. As such, the Court finds that there is substantial evidence to support the ALJ's decision to afford partial weight to Dr. Koricke's opinion.

### 3. Dr. Keppler

Plaintiff argues that the ALJ should have afforded more than little weight to the opinion of Plaintiff's orthopedic surgeon, Dr. Louis Keppler, M.D. ECF Dkt. #15 at 16. In March 2016, Dr. Keppler diagnosed Plaintiff with lumbar canalstenosis with spondylolithesis at L4-L5, spondylolithesis with spina bifida occulta at L4-L5. Tr. at 480-81, 564, 568. Subsequently, on May 11, 2016, Dr. Keppler operated on Plaintiff, performing a lumbar laminectomy at L4 and L5 with lumbar diskectomy L4-L5 with posterior interbody fusion at L4-L5 with segmental spinal instrumentation and bilateral lateral fusion. *Id.* at 568. Plaintiff presented for a postoperative follow up visit on June 20, 2016, in which Plaintiff noticed a dramatic improvement in both his low back pain and leg symptoms. *Id.* at 479, 574. Dr. Keppler noted that Plaintiff ambulated with the use of a cane and continued to wear a lumbar back support. *Id.* Plaintiff's X-rays also demonstrated that the posterior

instrumentation and interbody fusion were in good alignment without any signs of displacement. *Id.*

On August 8, 2016, Dr. Keppler referred Plaintiff to physical therapy. Tr. at 575. On that same day, Dr. Keppler opined that Plaintiff was doing reasonably well following his surgery and his X-rays looked "excellent." *Id.* at 541, 576. Dr. Keppler did not see much bone consolidation and recommended the use of a bone growth stimulator. *Id.* Dr. Keppler also provided some answers to a questionnaire regarding Plaintiff's disability and included answers, not on the questionnaire form, but rather in a letter or note. *See id.* Only part of the questionnaire was provided in the record, starting with question #8 through to the signature page, and the form itself was left blank. *See id.* at 542-43. Dr. Keppler opined that Plaintiff "had preoperative leg and back pain," and that an "MRI and plain films demonstrate spondylolisthesis at L4-5." *Id.* at 541, 576. He noted that corresponding depression and anxiety are common emotional factors associated with lumbar spine disease. *Id.* Dr. Keppler limited Plaintiff to: never lifting, never carrying, occasional handling, occasional grasping, and frequent fingering. *Id.* He further stated that Plaintiff was in an early postoperative period and required narcotic analgesics, which limited his ability to function in any type of gainful employment. *Id.* He opined that Plaintiff, being in the early stages of rehabilitation, was not a candidate for any form of gainful employment, and his ultimate functional capacity will not be able to be evaluated until one year after his operation. *Id.*

On January 30, 2017, Plaintiff presented again to Dr. Keppler for a follow up visit. Tr. at 577. Dr. Keppler felt that the fusion site would show some knitting and wanted Plaintiff to continue on the bone growth stimulator. *Id.* He further noted that Plaintiff's preoperative symptoms were relieved by the surgery and that Plaintiff reported feeling much better than he did prior to the surgery, especially regarding his back pain. *Id.* They anticipated another follow up visit after three months. *Id.*

The ALJ heeded Dr. Keppler's note of August 8, 2016, which stated that Plaintiff was in an early postoperative period and limited his function in any type of gainful employment. Tr. at 20 (citing tr. at 541). The ALJ stated that "[w]hile this might have been

true at that time, the claimant recovered in such a manner that within one year, he was able to return to substantial gainful activity at a less than light exertional level, which he is still capable of performing." *Id.* The ALJ afforded little weight to Dr. Keppler's opinion. *Id.*

Specifically, Plaintiff contends that the ALJ failed to cite to any evidence in the record to support his conclusion that Plaintiff recovered within one year and was capable of substantial gainful activity at a less than light exertional level. ECF Dkt. #15 at 16 (citing tr. at 20). Defendant points to the fact that the ALJ discussed Dr. Keppler's January 2017 follow up notes for support. ECF Dkt. #18 at 12; Tr. at 19, 541, 577. The only other records the ALJ discussed during the relevant time period between Dr. Keppler's August 2016 opinion and January 2017 treatment notes were: an EMG showing neuropathy on September 26, 2016; carpal tunnel related records during November and December of 2016; and further hand treatment notes from January 5, 2017. *Id.* at 19. None of these other records the ALJ cited concern Plaintiff's spinal issues that Dr. Keppler treated.

Although Dr. Keppler's January 2017 treatment notes discuss some improvement in Plaintiff's symptoms, Dr. Keppler did not give an opinion as to Plaintiff's capacity to work. *Id.* at 577. As Dr. Keppler noted in his August 8, 2016 opinion, Plaintiff's ultimate functional capacity could not be determined until a year after the surgery, which would have been around May 2017. *Id.* at 541, 576. The ALJ appears to conclude that by January 2017, Plaintiff could perform substantial gainful activity at a less than light exertional level, but he cited to no evidence, and no support exists elsewhere in his decision. *Id.* at 20. As such, the Court finds that there is a lack of substantial evidence in affording little weight to Dr. Keppler's opinion.

### 4. Dr. Frangiamore

Plaintiff contends that the ALJ should have afforded more than partial weight to the opinion of consultative examiner, Dr. Salvatore Frangiamore, M.D. ECF Dkt. #15 at 16. Dr. Frangiamore evaluated Plaintiff on January 16, 2016 and noted his history of hand and back problems. Tr. at 351-62. He found that Plaintiff had the following probable diagnoses: (1) lumbago with possible sciatica on the right without any gross motor or lower extremity

deficits; and (2) bilateral chronic hand pain with hypersensitivity at his amputated DIP joints in his second, third, and fourth digits on the left hand and pain with grip or range of motion on his right hand due to a previous injury without any gross motor or sensory deficits. *Id.* at 355. Dr. Frangiamore opined that Plaintiff had the following limitations:

> The claimant has mild limitations with sitting, standing, and walking due to lumbago and sciatica. The claimant does not need an assistive device with regards to short and long distances and uneven terrain. The claimant has mild to moderate limitations with lifting and carrying weight due to fingertip hypersensitivity and bilateral hand pain and weakness. There are limitations on bending, stooping, crouching, squatting and so on and the claimant will be able to perform these occasionally due to lumbago and sciatica. There are manipulative limitations on handling, feeling, grasping, fingering and the claimant will be able to perform these occasionally due to bilateral hand pain and amputation. There are no manipulative limitations on reaching and the claimant will be able to perform this frequently. There are no relevant communicative or work place environmental limitations. There may be some relevant visual limitations due to decreased visual acuity bilaterally.

Tr. at 355-56.

The ALJ afforded partial weight to Dr. Frangiamore's opinion and described his report as "vague." Tr. at 19. He stated that since Dr. Frangiamore's opinion was generated in January of 2016, before Plaintiff's surgeries and recoveries, it did not have the benefit of the entire record. *Id.* For support, the ALJ cited to Plaintiff's records from June 20, 2016, which noted that Plaintiff noticed a dramatic improvement in both his low back pain and leg symptoms. *Id.* (citing tr. at 479). The ALJ also cited to hand treatment notes from January 5, 2017, which showed Plaintiff no longer required any narcotic pain medication and that he noticed some difference with decreased pain and increased sensation in his hand, which he was very happy about. *Id.* (citing tr. at 745). For further support, the ALJ cited to treatment notes from January 30, 2017, which showed that Plaintiff's preoperative symptoms were relieved by surgery and that he felt much better than he did prior to the surgery, especially with regard to his back pain. *Id.* (citing tr. at 577).

Plaintiff argues that the ALJ unreasonably determined that Plaintiff's bilateral chronic hand pain improved with carpal tunnel surgery. ECF Dkt. #15 at 16. He contends that although the carpal tunnel surgery may have provided some relief with the numbness and tingling in his hands, the surgeries did nothing to alleviate the pain from the amputations

16

in his left hand and the crush injury to his right hand. *Id.* at 16-17. For support, Plaintiff cited to an August 2017 report from Dr. Hanicak, noting Plaintiff's subjective complaints that he continued to struggle with daily pain, especially in his back and neuropathic pain in his upper extremities since his carpal tunnel surgery. *Id.* at 17 (citing tr. at 657).

Notably, the ALJ afforded *partial* weight to Dr. Frangiamore's opinion despite the fact that Plaintiff had carpal tunnel surgery after his examination. Tr. at 19. In relevant part, the ALJ cited to certain improvements in Plaintiff's hand condition post-surgery to support his decision to afford only partial weight to this opinion. *Id.* (citing tr. at 750). Also, the ALJ ultimately determined that Plaintiff has the RFC to perform only light work with the following limitations on Plaintiff's hands, namely, he can handle items occasionally with the left hand, can handle items frequently with the right hand, can never finger with the left hand, but can frequently finger with the right hand, and can never feel with the left hand. *Id.* at 16. Accordingly, the Court finds that the ALJ cited to substantial evidence in giving only partial weight to Dr. Frangiamore's opinion by citing to certain improvements or changes to Plaintiff's relevant conditions that occurred after his examination with Dr. Frangiamore.

### 5. Dr. Hanicak

Plaintiff next argues that the ALJ should have afforded more than little weight to the opinion of treating physician, Dr. John Hanicak, M.D. ECF Dkt. #15 at 17-18. Plaintiff began treating with Dr. Hanicak on February 25, 2016. Tr. at 545, 551, 661, 664. During Plaintiff's first office visit, Dr. Hanicak noted Plaintiff's subjective history and examined him. Tr. at 551-52. The main reason for this initial visit was for Plaintiff's low back pain due to ongoing pain that radiated down both legs. *Id.* at 553. Dr. Hanicak found that Plaintiff generally appeared well but noted diffuse muscle spasms, antalgic gait, and muscle weakness (4/5) of the right lower extremity. *Id.* at 552. Dr. Hanicak diagnosed him with midline low back pain with right-sided sciatica, other constipation, dental disease, intervertebral lumbar disc disorder with myelopathy in the lumbar region, and chronic low back pain. *Id.* at 551-53.

On November 1, 2016, Dr. Hanicak completed a Medical Source Statement and Mental RFC Assessment, but he did not provide answers to all of the questions on the forms. Tr. at 545-50. In both forms, he provided the diagnosis of chronic or midline low back pain with right-sided myelopathy or sciatica. *Id.* He opined that Plaintiff would be off task in an eight hour work day greater than 25% of the time. *Id.* at 546, 549. He then filled out a check box form for Plaintiff's mental limitations and further estimated that as a result of his physical impairments, Plaintiff's functional limitations in an eight hour work day would be limited to never lifting, carrying, handling, grasping, and fingering. *Id.* at 547-49. He further opined that Plaintiff would be absent from work due to his impairments because of his severe back pain, which makes it hard for him to get around. *Id.* at 550.

Plaintiff presented once again to Dr. Hanicak on August 2, 2017 due to back pain. Tr. at 653-60. Dr. Hanicak examined Plaintiff and noted normal findings. *Id.* at 659. He also found the following diagnoses: chronic midline low back pain with right-sided sciatica; PTSD; neuropathy in his upper extremity, unspecified laterally; complete traumatic metacarpophalangeal amputation of left index finger, subsequent encounter; complete traumatic MCP amputation of left middle finger, subsequent encounter; complete traumatic transphalangeal amputation of left ring finger, subsequent encounter; crushing injury of right hand, sequela; carpel tunnel syndrome, bilateral; chronic neck pain; and generalized osteoarthritis ("OA"). *Id.* at 659-60. Dr. Hanicak recommended for Plaintiff to consult to physical therapy for all of the aforementioned diagnoses except for PTSD. *Id.*

On August 11, 2017, Dr. Hanicak again filled out a Medical Source Statement and Mental RFC Assessment. Tr. at 661-66. As in his earlier opinion, Dr. Hanicak did not provide answers to all of the questions. *See id.* His answers in the Medical Source Statement were virtually the same as before. *See id.* at 545, 549-50, 661-63. His check box answers in the Mental RFC form were different, with more boxes checked as "not significantly limited" in his more recent August 2017 opinion. *See id.* at 547-48, 665-66.

The ALJ afforded little weight to Dr. Hanicak's opinions. Tr. at 20 (citing tr. at 544-59, 661-66). The ALJ stated that Dr. Hanicak completed check box-type opinions where he

checked that the claimant would not be able to work, and never be able to lift or carry 10 pounds, or handle, grasp, or finger. *Id.* (citing tr. at 661-63). The ALJ also noted that Dr. Hanicak completed a "mental" assessment where he only mentioned Plaintiff's physical limitations. *Id.* (citing tr. at 664-66). In affording only little weight to Dr. Hanicak's opinions, the ALJ reasoned that his opinions contained extreme and unsubstantiated limitations and lacked cited evidence. *Id.* To note, the ALJ did not otherwise discuss Dr. Hanicak's opinions or examination findings elsewhere in his decision. *See* tr. at 8-23.

Plaintiff avers that the ALJ did not comply with the treating physician rule because he failed to provide "good reasons" for affording less than controlling weight to Dr. Hanicak's opinions. ECF Dkt. #15 at 17-18. He argues that the ALJ's one-sentence conclusion was insufficient and he did not cite to any contrary or inconsistent evidence in the record. *Id.* at 18. In addition, Plaintiff argues that the record supports a finding that Plaintiff suffers from degenerative disc disease of the lumbar spine with myelopathy, an impairment that the ALJ also found to be "severe" at step two of the sequential process. *Id.* at 18; tr. at 14. Plaintiff avers that Dr. Hanicak's opinion regarding the severity of impairments was based upon his observations and clinical exams and is not an "unsubstantiated" opinion. ECF Dkt. #15 at 18.

A treating source[4] is a claimant's own acceptable medical source who provides, or has provided, medical treatment or evaluations and who has, or has had, an ongoing treatment relationship with that claimant. *See* 20 C.F.R. § 404.1527(a)(2) (defining "treating source"). An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. 20 C.F.R.

---

[4] The undersigned notes that the SSA has changed the treating physician rule effective March 27, 2017. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules and will consider the supportability and consistency factors as the most important factors.

§ 404.1527(c)(2)[5]; *Price v. Comm'r Soc. Sec. Admin.*, 342 Fed.Appx. 172, 175-76 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ declines to give controlling weight to the opinion of a treating source, he must determine the weight to give that opinion based upon a number of regulatory factors. 20 C.F.R. § 404.1527(c)(2). Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson*, 378 F.3d at 544, citing 20 C.F.R. § 404.1527(c); *see also* 20 C.F.R. §416.927(c).

Although an ALJ must "consider" all of the factors in 20 C.F.R. § 404.1527(c) and must "apply" the factors listed in 20 C.F.R. § 404.1527(c)(2), including its subsections, through (c)(6) to determine the weight to give that opinion, he is not required to discuss every factor in his decision as long as he provides "good reasons." 20 C.F.R. § 404.1527(c)(2); Social Security Rule ("SSR") 96-2p, 1996 WL 374188, at *5 (1996)[6]; *Francis v. Comm'r Soc. Sec. Admin.*, 414 Fed.Appx. 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis.") (internal citation omitted). Under the "good reasons" rule, the ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, at *5. This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an

---

[5] 20 C.F.R. § 416.927 governs SSI determinations, while 20 C.F.R. § 404.1527 governs DIB determinations. These regulations are virtually identical, and, for convenience, the Court will only cite to the DIB regulations.

[6] Effective March 27, 2017, SSR 06-03p, 96-2p, and 96-5p have been rescinded by Fed. Reg. Notice Vol. 82, No. 57, page 15263. These regulations are still effective for claims filed before March 27, 2017.

administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007) (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004).

The ALJ does not state whether or not he considers Dr. Hanicak to be a treating physician. *See* tr. at 20. As described above, Dr. Hanicak provided his first opinion after only one visit, according to the record. *See* tr. at 545-59. He then provided a second opinion shortly after what appears to be Plaintiff's second visit, as evidenced in the record. *See* tr. at 653-66. The Sixth Circuit has held that a single examination does not suffice to afford treating physician status. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 506 (6th Cir.

2006) (also noting that "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship.") (citing *Cunningham v. Shalala*, 880 F.Supp. 537, 551 (N.D.Ill.1995) (where physician saw claimant five times in two years, it was "hardly a foregone conclusion" that his opinion should be afforded great weight)); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (finding treating physician rule did not apply to clinical psychologist who examined claimant only once, was paid by SSA to examine claimant, and administered no treatment); *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir. 1989) ("Dr. Zupnick is not a treating physician given the fact that he evaluated the claimant on only one occasion."). Nevertheless, Defendant appears to concede that Dr. Hanicak is a treating physician and makes no argument to the contrary. *See* ECF Dkt. #18 at 13 ("The ALJ also reasonably concluded that the opinion of Plaintiff's treating physician, John Hanicak, M.D., was only entitled to little weight.").

Even under the higher standard afforded to treating physicians, the ALJ provided a "good reason" to afford only little weight to Dr. Hanicak's opinion. The Court notes that the ALJ's first reason to discount this opinion would not meet the substantial evidence standard and would also not be a "good reason" under the treating physician rule. As previously mentioned, the ALJ did not discuss Dr. Hanicak's examination findings anywhere in his decision. *See* tr. at 8-23. The ALJ simply repeated Dr. Hanicak's opinions, but he did not explain why he found it to be "extreme and unsubstantiated" and provided no real discussion of any contrary record or objective medical evidence to support why this opinion. The only viable support in his decision is the ALJ's reference that the opinion included check boxes.

However, the next reason is enough to meet the substantial evidence standard and would also meet the "good reasons" requirement of the treating physician rule. The ALJ correctly noted that Dr. Hanicak's opinions included check boxes and Dr. Hanicak did not specifically cite to evidence for support. Tr. at 20. The Sixth Circuit has explained that an ALJ may properly discount a treating physician's opinion when the opinion is in the format of a conclusory checkbox questionnaire. *Ellars v. Comm'r of Soc. Sec.*, 647 Fed.Appx. 563,

566 (6th Cir. 2016) (finding that ALJ may properly afford little weight to treating physician's two-page check-off form that did not cite to objective medical evidence); *Serrano v. Berryhill*, No. 1:17CV2644, 2019 WL 691311, *23-24 (N.D. Ohio Jan. 30, 2019) (Limbert, J.), *report and recommendation adopted Serrano v. Comm'r of Soc. Sec.*, No. 1:17CV2644, 2019 WL 669634 (N.D. Ohio Feb. 19, 2019) (finding the same). Additionally, ALJ's are not bound by "conclusory statements of physicians, particularly where the statements are unsupported by detailed objective criteria and documentation in the medical record, and are inconsistent with the rest of the evidence." *Ellars*, 647 Fed.Appx. at 565-66 (citing *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001)).

Dr. Hanicak had the opportunity to supplement his checkbox and written answers to lend support to his opinion. He left several important questions blank and did not explain anywhere the precise and objective reasons for his opinions. *See* tr. at 545-50, 661-66. For example, the Medical Source Statement forms included a question asking the provider to "[i]dentify any clinical findings, laboratory findings and diagnostic test results which support [Plaintiff's] diagnosis and the dates tests were performed." *See* tr. at 545, 661. Although an answer to this question would have provided authority for his opinion, Dr. Hanicak left this question blank in both of his opinions. *Id.*

Accordingly, the Court finds that the ALJ's treatment of Dr. Hanicak's opinions is supported by substantial evidence. Specifically, the ALJ's reasoning that Dr. Hanicak's failure to cite to evidence to support his conclusory opinions constitutes substantial evidence, and it would also constitute a "good reason" to afford little weight to his opinions.

### B.    DUTY TO DEVELOP RECORD

Plaintiff's second main contention is that the ALJ failed in his duty to develop the record when he declined to issue a subpoena to obtain the reports of Dr. Deborah Koricke and Dr. Elizabeth Mease. ECF Dkt. #15 at 19-20. Plaintiff's counsel sent a due diligence letter dated September 28, 2017, stating that she was unable to gather medical records from Dr. Koricke and Dr. Mease. Tr. at 11, 751-52. Consequently, Plaintiff's counsel requested the ALJ to subpoena those medical records. *Id.* Plaintiff specifically sought records of a

psychological evaluation conducted by Dr. Koricke, dated August 3, 2016, and a physical examination conduced by Dr. Mease, dated August 2, 2016. ECF Dkt. #15 at 19; Tr. at 752. In her letter to the ALJ, Plaintiff's counsel wrote "[w]e think these records are crucial for Mr. Yoder's case." Tr. at 751. At the time of the October 13, 2017 hearing, Plaintiff was still unable to gather those records. *Id.* at 11, 72-73.

In his decision, the ALJ characterized Plaintiff's request as being for "one-time examination reports." *Id.* at 11; *see also id.* at 73. In denying the subpoena request, the ALJ reasoned the following:

> After further review, Dr. Deborah Koricke is a consultative examiner who examined the claimant, whose report had already been exhibited at Exhibit 1F. Since these records are not likely to have any effect on the outcome of the decision, I decline to subpoena these records.

Tr. at 11-12 (citing Dr. Koricke's June 7, 2016 examination at tr. at 317-23). At the hearing, the ALJ also stated that "since [the requested records are] just a one-time exam and no treatment, no – nothing that could, you know, change the case one way or the other, I'm not inclined to subpoena them." *Id.* at 73.

The claimant has the burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination. 20 C.F.R. §§ 404.1512, 416.913(d); *Brown v. Sec'y of Health & Human Servs.*, 911 F.2d 731 (6th Cir. 1990) (citing *Landsaw v. Sec. of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986)). However, the Plaintiff's duty to prove disability with a complete record must be balanced against the ALJ's duty to develop the record. The regulations provide the following:

> In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 404.1512(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (e).)

20 C.F.R. § 404.1545(a)(3).

In certain circumstances, an ALJ has a special, heightened duty to develop the record, but only when a claimant is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc. Sec.*, 280 Fed.Appx. 456, 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir.1983)). Absent such special circumstances, the claimant bears the ultimate burden of proving disability. *Id.* (citing *Trandafir v. Comm'r of Soc. Sec.*, 58 Fed.Appx. 113, 115 (6th Cir.2003)).

The ALJ cited the applicable rule regarding subpoenas, which is "[w]hen it is reasonably necessary for the full presentation of a case, an [ALJ] *may* issue a subpoena on his or her own initiative or at the request of a claimant or appointed representative." Tr. at 11-12 (citing HALLEX I-2-5-78). The regulations also specifically state:

> When it is *reasonably necessary for the full presentation of a case*, an administrative law judge or a member of the Appeals Council *may*, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are *material to an issue at the hearing*.

20 C.F.R. § 404.950(d)(emphasis added). Although this rule contains discretionary language, the Hearings, Appeals and Litigation Law Manual (HALLEX), which was cited by the ALJ, interpreted this rule to require the ALJ to issue a subpoena on a claimant's timely request if the claimant shows (1) that an individual has evidence or can offer testimony that the claimant cannot obtain without the subpoena, (2) the ALJ determines that the evidence or testimony is reasonably necessary for the full presentation of the case, and (3) the ALJ has exhausted other means of obtaining this evidence or testimony. *See* HALLEX I-2-5-78(B)(2); *see also* 4 Soc. Sec. Law & Prac. § 52:37: Subpoenas—Issuance (2019).

Specifically, Plaintiff reasons that the ALJ could not have determined whether the requested records would benefit Plaintiff's claim or not without having examined such records. *Id.* at 20. This argument fails for two reasons. First, this argument is illogical and circular because it presumes that the ALJ must *first* examine the records *before* making a determination to issue a subpoena. Second, Plaintiff has the burden to show why the records

are reasonably necessary for the full presentation of his case. Plaintiff does not, however, explain how these records were reasonably necessary for the full presentation of his case or how they were otherwise material to his case. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). Nor does he argue that the ALJ was under a special duty to develop the record under *Wilson*. To note, Plaintiff was represented by counsel, and therefore, the ALJ was under no special, heightened duty to develop the record. *See Trandafir v. Comm'r of Soc. Sec.*, 58 Fed.Appx. 113, 115 (6th Cir. 2003).

For the above reasons, the Court finds that the ALJ applied the proper legal standards and set forth sufficient reasons for denying Plaintiff's request to subpoena medical records from Dr. Koricke and Dr. Mease.

## VI.    CONCLUSION

For the above reasons, the Court orders that the decision of the ALJ is REVERSED and REMANDED for reevaluation of Dr. Keppler's opinion.


Date: September 17, 2019                    */s/George J. Limbert*
                                            GEORGE J. LIMBERT
                                            UNITED STATES MAGISTRATE JUDGE